Filed 3/7/16  P. v. Johnson CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANTHONY PAUL JOHNSON et al.,<br><br>    Defendants and Appellants. | G047335<br>(Consol. with G047907, G048760 &<br>G048909)<br><br>(Super. Ct. No. 09ZF0050)<br><br>O P I N I O N |

Appeal from judgments of the Superior Court of Orange County, Patrick H. Donahue, Judge.  Affirmed in part, reversed in part, and remanded with instructions.

R. Clayton Seaman, Jr., under appointment by the Court of Appeal, for Defendant and Appellant Anthony Paul Johnson.

Michelle May Peterson, under appointment by the Court of Appeal, for Defendant and Appellant Truc Ngoc Tran.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant Giang Thuy Nguyen.

Khouri Law Firm and Michael J. Khouri for Defendant and Appellant Tam Hung Nguyen.

Kamala D. Harris, Attorney General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Charles C. Ragland, Meagan J. Beale, Marvin E. Mizell, Michael Pulos and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

*       *       *

Appellants were convicted of conspiring to murder and murdering Viet Nguyen.[1] Although Viet was a member of appellants' own gang, the prosecution theorized they murdered him out of fear he might implicate them in a home invasion robbery that went awry for the gang shortly before Viet was killed. In this consolidated appeal, appellants challenge nearly every aspect of their trial, ranging from jury selection to sentencing. While most of their claims are unmeritorious, it is undisputed appellants' sentences are partially incorrect and need to be revisited. Therefore, we reverse their sentences and remand for resentencing. In all other respects, we affirm.

FACTS

*Appellants' Gang*

At the time Viet was murdered in February 1995, he and appellants Anthony Johnson, Truc Tran, Giang Nguyen and Tam Nguyen were members of a criminal street gang known as Viets for Life (VFL). Ranging in age from 17 to 22 years old, they lived in a tight-knit neighborhood in Westminster. VFL's primary activities included murder, conspiring and attempting to commit murder, home invasion robbery and gun possession. While nearly everyone in the gang was Vietnamese, it was led by Johnson, a Caucasian. He had a dominant, intimidating personality that commanded respect, and as the head of VFL, other members of the gang were expected to do what he said. Whereas Johnson was VFL's "shot caller," Viet was a relative newcomer to the gang at the time this case arose.

---

[1] The surname Nguyen is common to several people involved in this case. To avoid confusion, we will refer to them by their first names after they are initially introduced in the opinion. No disrespect is intended.

*The Botched Home Invasion Robbery*

Sometime in 1994 or early 1995, Westminster High School student Dan McDonald received about $20,000 in cash as part of an insurance settlement. The settlement was no secret; McDonald spent the money freely and even photographed himself rolling around in it on his bed. Viet was a good friend of McDonald, but after he heard about the insurance settlement, he told Johnson about it, and they hatched a plan to steal McDonald's money.

The plan was put in motion on February 24, 1995. Around eight o'clock that morning, Johnson, Giang and Viet entered McDonald's home wearing bandanas over their faces. They were hoping the house would be empty, but as it turned out, both McDonald and his mother Betty were home. Johnson confronted McDonald with a knife or a gun and demanded his money, while Giang pointed a gun at Betty and Viet stood near the front door. Although McDonald and Betty initially thought the encounter was some sort of joke, they realized that was not the case after Johnson hit McDonald and tied him up.

During the robbery, Johnson told everyone what to do and where to go. But Viet got cold feet when, despite his bandana, Betty recognized him as a friend of the family. Although McDonald never saw Viet, Betty was sure he was the guy who was standing by the front door. Realizing he had been recognized, Viet got scared and ran out of the house in the middle of the robbery, leaving his companions in the lurch. Johnson and Giang rummaged through the house for another minute or so, taking $80 from Betty's purse, but they were unable to locate McDonald's settlement money before fleeing the scene.

*The Party at Ingrid's House*

That evening, appellants went to a party at the Midway City home of Tam's 14-year-old girlfriend Ingrid S. Besides appellants and Ingrid, Viet and his best friend Binh Nguyen were at the party, as were VFL associates Terry Tackett and Ngoc Nguyen,

3

aka Chuckee. During the party, Viet called his friend Linh Vu and told him he had been involved in a robbery early that day. Viet said he had "messed up" the robbery, and Vu sensed he was worried about the situation. They only talked for a few minutes before Viet told Vu he had to go and hung up on him. After that, Viet, Ngoc and Tam left the party in Viet's van. They departed Ingrid's house around midnight and never returned to the party.

*The Murder Scene*

About an hour later, Lucia Carter was driving on the connector to the 405 and 73 freeways in Costa Mesa when she noticed Viet's van on the side of the road. As she passed the area, she saw an Asian man running from the back of the van to a white four-door sedan that was waiting about 20 feet away.

Later that morning, around 7:00 a.m., CHP Officer Scott Wayne was dispatched to that area of the roadway and made a grisly discovery. Upon looking inside Viet's van, he found Viet's lifeless body slumped over the steering wheel with two bullet holes in the back of his head. Investigators determined Viet had been shot from behind at close range. Based on blood splatter marks inside the van, they also determined the front passenger door had to have been open during the second shot. A loaded .45 caliber handgun was found on an embankment near the van, but no fingerprints were found on the weapon.

*Post-Murder Events*

While Officer Wayne was discovering Viet's body, Ngoc was calling Binh and telling him to meet him at Tackett's house for some important news. When Binh arrived there, Tackett, Ngoc and all four appellants were present, but Johnson did most of the talking. He said Viet had been shot and killed while he was trying to rip off a Mexican drug dealer. He also directed Binh and Ngoc to come up with an alibi as to where they were at the time Viet was killed. Later that day, when the police contacted Binh, he told them that he and Ngoc had spent the previous night at the movies.

4

Tam's girlfriend Ingrid testified that in the wake of Viet's death, Tam made a comment to her about having had to "take someone out." When Ingrid asked Tam what he was talking about, he said he was just joking and changed the subject, but Ingrid sensed he was hiding something.

Eventually, Ingrid and Tam moved to Texas, as did Johnson and Tran. The case went cold for over a decade until the police contacted Ngoc in Iowa in 2008. In exchange for immunity from prosecution, Ngoc told authorities how Viet was murdered and agreed to testify against appellants at their trial.

*Ngoc's Testimony*

Ngoc testified it was actually Giang's idea to steal Dan McDonald's money. However, Johnson is the one who came up with all the details about how they were going to pull off the robbery. The original plan called for Viet to be the getaway driver, but Ngoc eventually agreed to take on that role. Ngoc drove Viet, Johnson and Giang to the scene in his white two-door Acura, and then waited outside in his car while they went into McDonald's house.

After awhile, Ngoc began to get nervous and started driving up and down the street near McDonald's house. Then he saw Viet running toward his car and stopped to let him in. Viet was very distraught because, contrary to what he had expected, McDonald and his mother Betty were home when they entered the house. Viet told Ngoc, "This is all fucked up" and began fretting about the fact Betty had recognized him. About five minutes later, Johnson and Giang came running up to Ngoc's car. Johnson, who was holding a knife, yelled at Viet, "Where the fuck were you? Why did you [take] off?" Viet told Johnson that Betty had recognized him, but Johnson was still very upset with him, as was Giang. They were not only angry Viet fled in the middle of the robbery but also upset that they only got $80 out of it. Although the group managed to get away before the police arrived at McDonald's home, they were distraught about the way things had turned out.

5

That evening, Johnson called Ngoc and invited him over to Ingrid's house to hang out and party. Ngoc was not in the mood to socialize, but urged on by the shot-caller, he drove to Ingrid's place in his Acura. Appellants, Viet, Binh and Tackett were already there when he arrived. Johnson talked to Ngoc about how Viet had "panick[ed]" and "tripped out" during the robbery. He worried aloud that Viet was "going to talk to the police."[2] Giang was worried, too. He told Ngoc he never would have gotten him involved in the robbery had he known how bad it was going to turn out. When Ngoc saw Viet at the party, Viet was visibly upset. Although Ngoc tried to calm him down, Viet could not stop worrying about the fact Betty McDonald had recognized him during the robbery.

Around midnight, Johnson approached Ngoc and Viet and asked them if they would go and pick up some drugs for him. After they agreed, Johnson told them to take Tam along because he knew where to go. As they were getting ready to leave the party, Giang obtained Ngoc's car keys from him. Then, Viet, Ngoc and Tam set out in Viet's van to get the drugs; Viet drove, Ngoc sat in the front passenger seat, and Tam was in the back.

Along the way, Tam gave Viet directions. But they never connected with any drug dealers. While they were driving on the freeway, Tam told Viet to pull over, claiming he was not feeling well. After Viet complied, Tam pulled out a gun and shot him twice in the back of the head. Ngoc, who had been dozing off during the drive, was shocked by the shooting. At Tam's direction, he ran to a light green Honda sedan that had pulled up behind Viet's van. Ngoc recognized the car as belonging to Giang's girlfriend Tammy Phan, but she was not driving the car, Tran was. Tam had Ngoc get in the car, and Tran drove them away.

---

[2] Johnson had good reason to worry about this. In 1992, after he and Viet got pulled over for driving a stolen van, the police found a sawed-off shotgun in the vehicle. Johnson claimed he knew nothing about the gun, but when the police questioned Viet, he said he had recently seen Johnson with the weapon.

6

The trio headed to a bowling alley, where Tran made a phone call. Then they went to a hotel in Anaheim and met Giang and Johnson, who were driving Ngoc's car. After Johnson checked into the motel, he asked Tam and Tran, "Is it all done?" Tran nodded and said, "yeah." Then all five of them went into a room at the motel.[3]

Inside the room, Johnson implored everyone to keep quiet about the shooting and to start thinking about alibis for where they were that night. To that end, Johnson told Ngoc to get in touch with Binh, so they could work out a story together. Ngoc was scared, but throughout the evening Johnson remained calm as he plotted the group's next move. At sunup, Ngoc said he had to go, and Johnson told him to remember what he had said earlier. Even though Ngoc was not in on the plan to kill Viet, Johnson told him it was important for him to keep quiet because he was involved in what happened.

Ngoc went home, threw his clothes in the trash and took a shower. Then he met up with appellants near Tackett's house. There, Johnson told everyone that if people started asking questions about Viet, they should say he was killed in a drug deal. And when Binh arrived at Tackett's house later that morning that is precisely what Johnson told him. At that time, Ngoc and Binh also came up with their alibi. True to their plan, when the police interviewed Ngoc later that day he claimed that he and Binh were at the movies when Viet was murdered.

A few days later, Ngoc met up with appellants at a park in Fountain Valley. At the meeting, Johnson showed everyone a newspaper article about Viet's murder. Chuckling as he read the piece, Johnson remarked, "[S]ee, they don't have a lot of news. They got very few clues." Johnson also suggested they should all move to Texas until

---

[3] The room was registered to Linh Vu, who, as mentioned above, had spoken to Viet by phone earlier that evening at Ingrid's party. At trial, Vu denied renting the room, but he admitted his brothers had close ties to Johnson and VFL.

everything blew over. He promised everything would be okay if they all just stuck together.

As it turned out, the group did not stick together, but they did keep quiet for many years. In fact, the one time Ngoc visited Johnson in Texas, they did not even discuss the botched home invasion robbery or Viet's death. And by the time the police contacted Ngoc in Iowa in 2008, he had lost touch with Johnson altogether. Married with children then, Ngoc had put the entire ordeal behind him and did not want to get involved in the case. However, after the police intimated they might charge him as an accomplice to murder, he confessed to what happened.[4]

*Appellants' Statements to the Police*

When the police initially interviewed Johnson about the case in March 1995, he denied any wrongdoing. However, when they interviewed him again in 2006, he admitted pulling off the McDonald robbery with Viet and Ngoc and meeting up with them later that night at Ingrid's house. Johnson also admitted owning a .45 caliber revolver and having a reputation as VFL's kingpin back when Viet was murdered. Asked if he knew anyone who might have information as to how Viet was killed, Johnson said Ngoc would because "'he was sitting there in the car with [Viet]'" when Viet was shot.[5]

In October 2008, a team of police officers seeking information about the murder went to Tam's home in Minnesota. The officers knocked on Tam's doors and loudly announced their presence for about 15 minutes before Tam finally answered the door. When he did, the officers told him they wanted to talk to him about Viet's murder.

---

[4] Binh also testified to events surrounding the shooting. Like Ngoc, Binh said that he, Viet and appellants partied at Ingrid's house the night before the shooting. At the party, there was talk about the botched home invasion robbery, and at some point Viet and Ngoc left to do a drug run. Appellants also left the party around that time. The next morning, Binh met up with Ngoc and appellants at Tackett's house, where Johnson announced Viet had been murdered in a drug deal. It was at this time that Binh and Ngoc concocted their alibi about being at the movies the previous evening.

[5] The trial court instructed the jury Johnson's statements to the police were only admissible as to him and could not be used against his codefendants.

8

Tam said he did not know what they were talking about and claimed he did not even know who Viet was.

When Giang was interviewed by the police, he said his girlfriend Tammy Phan owned a blue or teal green Honda Accord. He also admitted driving Phan's car to Ingrid's party on the night Viet was killed.

### Gang Expert's Testimony

Mark Nye, a retired sergeant with the Westminster Police Department, testified as a gang expert for the prosecution. During his 25 years on the force, Nye worked as a liaison between the police and the Vietnamese community and investigated numerous crimes involving VFL members. While Nye knew appellants were all involved in criminal gang activity in the years leading up to Viet's death, he believed Johnson was the leader of VFL and directed the gang's activities.

Based on a hypothetical steeped in the facts of this case, Nye opined that if a gang member panicked and abandoned his fellow gang members during a crime, as Viet allegedly had done during the home invasion robbery, he would lose his gang's trust and respect and be "in a very serious predicament." And if the gang's leader decided to have him murdered, it would benefit the gang by removing "a weak link" from the gang and eliminating the possibility of him "ratting" to the police.

### The Verdict & Sentencing

Appellants were convicted of first degree murder and conspiracy to commit murder. (Pen. Code, §§ 187, 182.)[6] In addition, the jury found true special circumstances allegations the murder was committed to avoid arrest and while lying in wait. (§ 190.2, subds. (a)(5), (15).) The jury also found appellants acted for the benefit of their gang and Tam personally used a firearm. (§§ 186.22, subd. (b), 12022.5, subd. (a)). In addition, Johnson was found to have suffered two prior strike convictions, and

---

[6] Unless noted otherwise, all further statutory references are to the Penal Code.

Giang was found to have previously suffered a strike and a serious felony conviction and to have been on bail when the murder occurred. (§§ 667, subds. (a), (d), (e)(2)(A), 1170.12, subds. (b), (c)(2)(A), 12022.1, subd. (b).) The court sentenced appellants to, inter alia, life in prison without the possibility of parole (LWOP) for the murder, 25 years to life for the conspiracy and 10 years for the gang enhancement.

## DISCUSSION

### Jury Selection

Giang claims the prosecutor violated his constitutional rights by using his peremptory challenges to exclude Hispanic women from the jury. The claim fails for lack of evidentiary support.[7]

During voir dire, the first two groups of prospective jurors called for questioning included Patricia Romano and Evelisse DeJesus. The questioning revealed Romano has a nephew who has been involved with a gang "back east," and DeJesus' brothers have been convicted of gang-related crimes. While Romano said she has not spoken to her nephew in years and knows little about his gang activities, DeJesus said she has visited her brothers in jail from time to time. Both women said they could be fair and impartial if they were on the jury. However, the prosecutor used his first and third peremptory challenges to excuse them from the panel.

After several more prospective jurors were called and questioned, the prosecutor accepted the jury, which included a man named Gustavo Garcia, as constituted. However, defense counsel exercised several peremptory challenges, so the

---

[7] Tran and Johnson join this claim. Even though Giang's lawyer was the only defense attorney to raise this claim in the trial court, joinder is proper because prior to jury selection the attorneys stipulated that, unless stated otherwise, any motion or objection made by one of them should be deemed to have been made by all of them. Besides being a passport for joinder of claims on appeal, this stipulation also obviates the need for us to consider the Attorney General's various forfeiture arguments because nearly all of the issues raised in this appeal were preserved by a proper motion or objection by at least one of the defense attorneys. And those issues that were not preserved are the subject of ineffective assistance of counsel claims. We will therefore consider all of appellants' claims on their merits.

court called another group of prospective jurors that included Vanessa Ocampo, Cynthia Carrasco and Cynthia Cardona.

The prosecutor asked Ocampo if she would be able to vote guilty if the charges were proven beyond a reasonable doubt. After she answered in the affirmative, the prosecutor told her, "I'm picking on you because you may be a little bit younger than some of the other jurors." He then asked Ocampo if she would ever change her position during deliberations just to "go along with everybody else." Ocampo answered, "I don't think I would, no. . . . I don't feel like anyone sways my decision on anything. I feel like if I feel a certain way, I'm going to believe it."

At that point, the prosecutor reminded Ocampo jurors are not supposed to be too rigid. He asked her what she would do if the other jurors were trying to change her mind about the case. She said she "would go through [her] notes, . . . and kind of double-question everyone else's response or reasoning, but ultimately [she] would believe what [she] believe[s]." Continuing this line of inquiry, the prosecutor told Ocampo, "You'll excuse me for being both a sexist and an ageist. [But] do you think you would have any trouble expressing your opinions about the case during the deliberations to an older – let's say an older male juror, just hypothetically speaking?" Ocampo replied, "No, I wouldn't."

When the questioning got around to Carrasco, she said she has a cousin who works for the Los Angeles Sheriff's Department, and she herself has done clerical work for a police department in the past. She also said her brother was arrested as a teenager "years ago," and she has had two cars stolen, but she has never had any problems with gangs.

As for Cardona, she revealed she has been convicted of a misdemeanor drug offense, and her husband has been convicted of a gang crime for which he served 25 years in prison. She admitted those experiences might affect her ability to fairly judge the case.

11

During the next round of challenges, the prosecutor used his fifth peremptory challenge against Ocampo. That prompted Giang's attorney to request a sidebar, and the court met with counsel in chambers. Based on his belief that Romano, DeJesus and Ocampo were Hispanic, Giang's attorney claimed the prosecutor was targeting Hispanic women for exclusion in violation of *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). The court was skeptical as to whether Ocampo was actually Hispanic. In any event, it did not think there had been a prima facie showing of purposeful discrimination, so it denied Giang's *Wheeler* motion.

When voir dire resumed, the defense challenged one of the prospective jurors and Carrasco was seated in the jury box. The prosecutor accepted the jury as constituted, but the defense challenged the aforementioned Gustavo Garcia, and he was excused. After Cardona took his spot, the prosecutor used his sixth peremptory challenge against her. Then the defense excused Carrasco and seven new prospective jurors were called and questioned.

After the lunch break, the court briefly revisited Giang's *Wheeler* motion. While still harboring doubts as to whether Ocampo was actually Hispanic, the court acknowledged her name sounded Hispanic. The court also noted the prosecutor had passed a number of times when Hispanics were sitting in the jury box. Assessing the totality of the circumstances, the court simply did not believe a prima facie case of discrimination had been shown. For the record, Giang's attorney stated he did not object to Cardona's removal because she had suffered a drug conviction and her husband had done serious time in prison for gang-related crimes.

Eventually, the parties agreed on a jury that included one Hispanic woman, identified in the record only as Juror No. 11. However, about a week into the trial, she developed medical complications from her pregnancy, and her doctor placed her on bed rest. In meeting with counsel to discuss this development, the court raised the specter of having to replace Juror No. 11 for health reasons. Giang's attorney objected to her

12

removal, arguing it "would just emphasize the lack of Hispanic women [on] this jury and reinforce my [prior] *Wheeler* motion . . . ."

Responding to the renewed emphasis on his peremptory challenges, the prosecutor said, "I don't have the ability to any longer go back and explain to the court what my reasons were for excusing various jurors. I can assure the court that there are good nonrace reasons that I used all of my peremptory challenges." At that point, Giang's attorney clarified that, while he was concerned about the lack of Hispanic women on the jury, he was not making a new *Wheeler* motion. With that understanding in mind, the judge interrupted the hearing to have his clerk contact Juror No. 11 to see if she would be able to return to court after her bed rest. Juror No. 11 told the clerk she did not know if that was going to be feasible. Therefore, the court found good cause for her removal. That triggered a mistrial motion by Giang's attorney, but the court denied the motion and replaced Juror No. 11 with an alternate juror who served for the remainder of the trial.

The law is well established: "Both the state and federal Constitutions prohibit the use of peremptory strikes to remove prospective jurors on the basis of group bias. (*Batson* [*v. Kentucky* (1986) 476 U.S. 79, 89 (*Batson*)]; *Wheeler, supra*, 22 Cal.3d at pp. 276-277.) The now familiar *Batson/Wheeler* inquiry consists of three distinct steps. First, the opponent of the strike must make out a prima face case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges. Second, if the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications. Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination. [Citation.]" (*People v. Scott* (2015) 61 Cal.4th 363, 383.)

This case involves step one only. When, as here, the "trial court denies a *Wheeler* motion without finding a prima facie case of group bias the reviewing court considers the entire record of voir dire. [Citations.] As with other findings of fact, we examine the record for evidence to support the trial court's ruling." (*People v. Howard* (1992) 1 Cal.4th 1132, 1155.) In so doing, we must keep in mind peremptory challenges are presumed to be exercised for a nondiscriminatory purpose. (*People v. Salcido* (2008) 44 Cal.4th 93, 136-137.) And because *Wheeler* motions call upon trial judges' personal observations, their rulings are entitled to considerable deference on appeal. (*People v. Howard, supra,* 1 Cal.4th at p. 1155.) We will uphold their rulings so long as there is any substantial evidence to support them. (*People v. Jones* (2013) 57 Cal.4th 899, 917; *People v. Bonilla* (2007) 41 Cal.4th 313, 341.)[8]

Courts have identified a variety of factors and types of evidence as bearing on the question of whether there has been a prima facie showing of group bias in the jury selection process. For example, various forms of statistical evidence may be used to determine whether the prosecutor used a disproportionate number of peremptory challenges against members of a protected group.[9] (*People v. Scott, supra*, 61 Cal.4th at p. 384.) A reviewing court may also consider whether the prosecutor engaged those members in desultory questioning, whether the defendant is a member of the protected group, and whether the victim was a member of the group to which the majority of the jurors belong. (*Ibid*.) In addition, we may consider any "nondiscriminatory reasons for a

---

[8]     Giang urges us to independently review the trial court's ruling rather than apply the substantial evidence test. However, independent review is required only when 1) the trial court did not expressly articulate what standard it applied in denying the defendant's *Wheeler* motion, *and* 2) the motion was heard before *Johnson v. California* (2005) 545 U.S. 162 was decided, when a defendant challenging a peremptory excusal had to meet a more rigorous standard to establish a prima facie case of discrimination. (See, e.g., *People v. Scott, supra*, 61 Cal.4th at p. 384.) The first prerequisite for applying independent review is met here, but because appellants' trial occurred seven years after *Johnson* was decided, we presume the trial court applied the correct standard in deciding Giang's *Wheeler* motion. (*People v. Neuman* (2009) 176 Cal.App.4th 571, 579, fn. 10; *People v. Adanandus* (2007) 157 Cal.App.4th 496, 503.) Therefore, we will review that ruling under the deferential substantial evidence test. (*Ibid*.)

[9]     For purposes of the *Batson/Wheeler* inquiry, our Supreme Court has presumed women with Hispanic surnames are a protected group. (*People v. Bonilla, supra,* 41 Cal.4th at p. 344, fn. 14; *People v. Garceau* (1993) 6 Cal.4th 140, 171.)

14

peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias. [Citations.]" (*Ibid*.) "If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the [prospective] jurors in question, we affirm. [Citation.]" (*People v. Howard, supra*, 1 Cal.4th at p. 1155; accord, *People v. Pearson* (2013) 56 Cal.4th 393, 421; *People v. Panah* (2005) 35 Cal.4th 395, 439; *People v. Young* (2005) 34 Cal.4th 1149, 1172-1173.)

Here, the record shows that by the time Giang made his *Wheeler* motion, the prosecutor had used three of his first five peremptory challenges against women with Hispanic sounding surnames, i.e., Romano, DeJesus and Ocampo. The record also shows these were the first three Hispanic women called for questioning, and the prosecutor excused them as soon as he could, without waiting to see how they compared to other prospective jurors. However, as Giang admits, DeJesus was an "obvious" and permissible challenge due to the fact her brothers are convicted gang members. (*People v. Jones, supra,* 57 Cal.4th at p. 920; *People v. Watson* (2008) 43 Cal.4th 652, 674.)[10]

Moreover, Giang is not a member of the group that was allegedly targeted, nor does it appear that Viet was a member of the group to which the majority of the jurors belong. Giang argues these factors are not very important because "although [he] is not Hispanic, his trial attorney Joseph Gutierrez is, which is true of at least one of the other three defense attorneys. This is relevant because a prosecutor might hold the biased view that Hispanic jurors will favor a defendant whose counsel is Hispanic and might believe, in particular, that female Hispanics might be swayed by male Hispanic attorneys and defer to them, especially where, as here, the prosecutor admits he is sexist."

This argument is not persuasive. The prosecutor did apologize to prospective juror Ocampo for being "sexist" and "ageist" toward her. But it is clear from

---

[10]     The Attorney General claims Romano was also an obvious challenge because, like DeJesus, she said she had a relative who was involved in gangs. However, unlike DeJesus, Romano was not very close to her wayward relative, and she did not believe he had ever been convicted of a crime.

15

his questioning he was simply trying to soften the impact of questions designed to ascertain whether Ocampo had sufficient maturity and life experience to stand up for herself during deliberations, which is a legitimate concern with respect to all prospective jurors. (See *People v. Arias* (1996) 13 Cal.4th 92, 138-139; *People v. Sims* (1993) 5 Cal.4th 405, 430; *People v. Perez* (1994) 29 Cal.App.4th 1313, 1328.) While the prosecutor did not subject every young prospective juror to the type of questions he posed to Ocampo, the final jury was bereft of young people like Ocampo who had never been married or had children. This suggests the prosecutor's decision to challenge Ocampo was motivated by age, not race or gender. At the very least, the prosecutor's extensive questioning of Ocampo, as well as Romano, indicates his voir dire of the prospective jurors at issue was not token or desultory.[11]

Giang fears the trial court may have failed to consider Ocampo's removal in deciding whether the prosecutor's peremptory challenges were racially motivated because the court expressed skepticism about whether she is actually Hispanic. However, after putting aside its concerns in this regard, the court still did not think there had been a prima facie showing of discrimination. The court's comments regarding Ocampo's race are therefore not grounds for reversal.

Nor is the fact the trial court considered the prosecutor's willingness to accept the jury while Gustavo Garcia was seated in the jury box. While Garcia did not fit the exact description of the identified group – Hispanic *females* – race was a central component of Giang's motion. Therefore, it is relevant that the prosecutor was willing to keep Garcia on the jury. (*People v. Bell* (2007) 40 Cal.4th 582, 599 [in rejecting claim the prosecutor improperly targeted black *women* during voir dire, the court found it significant he kept three black *men* on the jury].)

---

[11] The prosecutor did not ask any questions of DeJesus, but that is understandable given that defense counsels' questioning of her revealed clear grounds for her excusal.

16

It is also telling of course that the prosecutor passed while Carrasco was seated in the jury box and that Juror No. 11 actually served on the jury before she was removed for health reasons.[12] While not dispositive on the issue of motive, the prosecutor's willingness to accept the jury while there was Hispanic women on it is a strong indication he did not intentionally target members of that group for removal. (*People v. Cunningham* (2015) 61 Cal.4th 609, 664; *People v. Williams* (2013) 56 Cal.4th 630, 663.)

In sum, there is substantial evidence to support the trial court's finding the prosecutor exercised his peremptory challenges in a constitutionally permissible fashion. We discern nothing in the record that would allows us to reject the trial court's evaluation of the situation and draw an inference of discriminatory intent in the jury selection process. Therefore, we uphold the trial court's decision to deny Giang's *Wheeler* motion.[13]

*Alleged Fourth Amendment Violation*

Tam contends the trial court should have suppressed the statements he made to the police in 2008 because they were obtained in violation of his Fourth Amendment rights. We disagree.

During an Evidence Code section 402 hearing, Costa Mesa Police Detective Michael Delgadillo testified to the circumstances surrounding Tam's statements. He said that on October 17, 2008, he and his sergeant Frank Rudisill went to Tam's home in Minnesota, along with a local police officer named Barry Pankinin. When they first arrived at Tam's house – a large, single-family dwelling – no one was home. But when they returned later in the day, there was a vehicle in front of the house. Because the engine compartment of the vehicle was warm, the officers approached Tam's

---

[12] On appeal, Giang does not challenge the removal of Juror No. 11 or the denial of his mistrial motion that was prompted by her removal. Nor does he challenge the removal of prospective juror Cardona given her husband's extensive negative experience with the criminal justice system and her own lesser experience.

[13] While our holding is couched in terms of the substantial evidence standard, we would reach the same conclusion applying de novo review to the proceedings below.

residence and began knocking on the front door. They were not in uniform, and their guns were not in sight. They banged on the door and loudly announced their presence for about 10 minutes, but no one answered. Then, while Delgadillo stayed at the front door, the other two officers went around to the side and back doors and began doing the same thing there. During this time, Delgadillo continued knocking and looked through the windows of the house, but he did not see or hear anyone.

Eventually, about 15 minutes after the officers arrived, Tam came to the front door. The officers identified themselves and said they wanted to ask him some questions about Viet's murder. Tam replied, "I don't know what you're talking about. I don't even know who you're talking about." For privacy purposes, Tam also asked if they could move the encounter into the backyard, and the officers obliged the request.

In the backyard, the officers patted down Tam and reiterated they where there to investigate Viet's murder. They told Tam that since they never had the chance to interview him at the time Viet was killed back in 1995, they wanted to hear his side of the story. When Tam continued to deny knowing Viet or anything about his murder, they told him Johnson had implicated him in the murder and offered to play a video of Johnson doing so. However, Tam said he was not interested in watching the video and requested an attorney, so the officers ceased their questioning. During the encounter, a fourth officer arrived, but not until the very end. None of the officers displayed their guns, gave Tam any orders or suggested he was under arrest. (In fact, Tam was not arrested until several months later.) Delgadillo did ask Tam to submit to a buccal swab for DNA testing purposes, but he refused to do so.

Tam moved to suppress any evidence and/or statements stemming from the encounter. At the motion hearing, Delgadillo testified he could not remember if Tam's backyard was surrounded by a fence. To clarify this issue, Tam's attorney requested to call Sergeant Rudisill and Tam's then-girlfriend as witnesses at the hearing. He said he intended to prove the police violated Tam's Fourth Amendment rights by either opening

18

a gate or scaling a six-foot fence to get into Tam's backyard. The judge denied the request for further testimony. He also denied defense counsel's request to introduce a Google map of Tam's house. However, the judge did eventually accept a photograph of Tam's residence, which indicates his backyard was surrounded by a fence.[14] Nevertheless, the judge found no basis to exclude Tam's statements.

In challenging this ruling, Tam admits the police had every right to knock on his front door. However, he contends the police violated his right to privacy by entering his backyard without his permission or a warrant. He submits, "It was not until [the] officers surrounded his home and stared through his . . . windows that [he] came to his door[, and by then], an illegal search had already occurred[.]" Therefore, his statement about not knowing Viet or anything about his murder should have been suppressed as a fruit of the illegal search.

Recognizing a home's curtilage – the area immediately surrounding the home – is protected by the Fourth Amendment (*Oliver v. United States* (1984) 466 U.S. 170, 180), the Attorney General concedes the police violated Tam's right to privacy by going into his backyard without a warrant and in the absence of exigent circumstances. The state also admits the officers in the backyard acted unlawfully to the extent they may have looked through the windows of Tam's residence. (*People v. Camacho* (2000) 23 Cal.4th 824 [officer's actions in looking into the defendant's window from a side yard of his home constituted an illegal search].) However, the state maintains there was not a sufficient connection between these illegal actions and Tam's decision to open his door and speak with the officers to justify excluding his statements from the trial. We agree.

---

[14]     At oral argument, counsel seemed surprised that we questioned whether this issue had been raised in the briefing. In fact, it was commented on in a footnote in the opening brief, and – since we presumed the property was fenced and there was no need for us to determine whether the trial court erred in denying Tam's request to present further evidence on the point – its significance was not fully appreciated.

The fact that even experienced and talented counsel would broach that issue in a footnote convinces us we should remind all that California Rules of Court, rules 8.204(a)(1)(B) and 8.360 require that each point raised as an assignment of error must be discussed under a separate heading or subheading. Failure to so designate them can result in a court refusing to consider the argument. (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 524.)

"It is well settled that evidence to be suppressed because of a Fourth Amendment violation must in some sense be the product of illegal government activity. [Citation.] Indeed, the challenging party must demonstrate 'an exploitative nexus' between the challenged evidence and the primary illegality. [Citation.]" (*People v. Holloway* (1985) 176 Cal.App.3d 150, 156; see also *People v. Williams* (1988) 45 Cal.3d 1268, 1299, overruled on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176 [evidence derived from unlawful police conduct is subject to exclusion at trial only if it is "tainted" by, i.e., causally linked to, such conduct].) To do this, the defendant must show the police would not have obtained the evidence in question had they not violated the Fourth Amendment. (*United States v. Jarvi* (10th Cir. 2008) 537 F.3d 1256, 1260.)

Tam contends his statements to the officers were the "direct result" of the officers' unconstitutional actions of "knocking on the front door, the back door, the side doors, and the windows of [his] house for approximately fifteen minutes non-stop." However, as he concedes, the officers had every right to knock on his front door. (*People v. Jenkins* (2004) 119 Cal.App.4th 368, 374 ["there is nothing in our constitutional jurisprudence that makes it illegal for police officers to knock on a person's door unless they first reasonably suspect the person has committed a crime"].) And the front door is where Detective Delgadillo stayed and continued knocking until Tam eventually answered the door. So the question is, did Tam carry his burden of proving his statements were attributable to the illegal aspect of the officers' actions, i.e., their entering Tam's backyard and knocking on his side and back doors?

The case of *United States v. Jarvi, supra,* 537 F.3d 1256 sheds light on this factually-sensitive question. There, the police lawfully stopped the defendant's truck for a traffic violation, but during the stop they illegally searched the truck and may have unlawfully detained the defendant himself. During the stop, the police also spoke with the defendant's passenger, who made statements that led to a search of the defendant's residence that turned up guns, drugs and a large amount of cash. (*Id*. at p. 1257.) On

appeal, the defendant argued the items found at his house should have been suppressed because they were the fruit of illegal police activity that occurred during the course of the traffic stop. However, the court rejected this argument on the basis the defendant failed to prove his passenger's statements were actually derived from an illegal aspect of the stop. While acknowledging the statements *could* have been the product of a Fourth Amendment violation, the court noted the opposite was also true. (*Id*. at p. 1260.) Under those circumstances, it was up to the defendant to establish "that if the police had not [illegally] searched his truck (or unlawfully detained him, if that violation were shown), they would not have ended up questioning [his passenger] and learning about the drugs in his house. [Citation.]" (*Id*. at p. 1261.) Because the defendant did not present any evidence in that regard, the court determined he failed to carry his burden of proof, and therefore his motion to suppress was properly denied. (*Ibid*.)

Likewise here, the record shows Tam's statements were preceded by police conduct that was both legal and illegal. As such, Tam had the burden of showing he would not have answered his door and spoken to the officers had the illegal conduct not occurred. Tam failed to meet that burden. While the record shows he did not answer his door until Rudisill and Pankinin entered his backyard, there is no evidence he ever saw them there or heard their knocking and yelling. (For all we know, Tam could have been asleep, in the shower or listening to music through headphones at that time.) And when Tam did come to the door, he did not go to one on which Rudisill or Pankinin had been knocking. Instead, he went to the front door, where Delgadillo was lawfully positioned.[15] On this record, it is unclear whether it was the illegal entry into Tam's backyard that prompted him to answer the door and speak with the officers, or he would have come to the door even if Rudisill and Pankinin had stayed in front with Delgadillo. Because Tam

---

[15] Tam contends Delgadillo overstayed his visit by knocking on his door for 15 minutes, which he describes as "almost comically lengthy period of time." However, "[i]t is the nature, not the duration of the intrusion" that dictates whether an illegal search has occurred. (*People v. Camacho, supra*, 23 Cal.4th at p. 834.) Because Delgadillo had every right to knock on Tam's front door, the fact that he did so for approximately 15 minutes is of no legal consequence.

21

did not present *any* evidence on this pivotal question, he failed to prove his statements to the officers were attributable to the illegal intrusion. Therefore, the trial court properly denied his motion to suppress.

*Severance Issues*

Tam, Giang and Tran contend they were denied a fair trial because they were tried with Johnson. Their argument is based largely on the fact they did not have the opportunity to cross-examine Johnson about certain statements he made before trial. However, because Johnson's statements did not directly implicate his codefendants in the alleged crimes, and because many of his statements were nontestimonial, their admission did not necessitate separate trials.

In cases involving multiple defendants, joint trials are generally preferred. (*People v. Lewis* (2008) 43 Cal.4th 415, 452.) However, the trial court may "order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses. [Citations.] Additionally, severance may be called for when 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' [Citations.]" (*Ibid.*)

The exception respecting incriminating statements of a codefendant is known as the *Aranda/Bruton* rule. (See *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123.) The rule "declares that a nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1120.) However, the confrontation clause is not violated by the admission of a nontestifying defendant's statements if they are redacted to eliminate any reference to his codefendants or their incriminating nature only

22

becomes apparent when they are linked to other evidence in the case. (*Richardson v. Marsh* (1987) 481 U.S. 200, 208-211; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1046-1047.) In other words, unless the statements in question are powerfully incriminating on their face, no Sixth Amendment violation will be found. (*Ibid.*; *United States v. Vega Molina* (1st Cir. 2005) 407 F.3d 511, 520; *People v. Fletcher* (1996) 13 Cal.4th 451, 455; *People v. Smith* (2005) 135 Cal.App.4th 914, 921-922; *People v. Archer* (2000) 82 Cal.App.4th 1380, 1386-1387.)

The parties and the court were well aware of the need for redaction in this case. In response to appellants' severance motion, the prosecutor took it upon himself to redact Johnson's 2006 statement to the police in order to omit any reference to his codefendants. Johnson's statement to the police in 1995 did include fleeting references to Tam, Tran and Giang; to wit, Johnson described Tam and Tran as his friends and fellow gang members, and he said he rode to the airport in the car of Giang's girlfriend Tammy Phan when he departed for Texas after the murder. However, these statements did not directly implicate Tam, Tran or Giang in the charged offenses. Rather, their "incriminatory effect depended entirely on [their] linkage to other evidence." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1177.) Because of this, and because the statements were admitted against Johnson only, they did not violate the *Aranda/Bruton* rule. (*Ibid.*; *Richardson v. Marsh, supra*, 481 U.S. at pp. 207-208.)

For largely the same reasons, the admission of Johnson's police statements did not run afoul of *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), which prohibits the admission of testimonial hearsay statements without a prior opportunity for cross-examination. Johnson's statements to the police may have been testimonial, but they were substantially redacted and their incriminatory effect only became apparent when linked to other evidence in the case. Under these circumstances, the statements did not implicate the confrontation rights of Johnson's codefendants. (*People v. Stevens* (2007) 41 Cal.4th 182, 199 ["The same redaction that 'prevent[ed] *Bruton* error also . . .

23

prevent[ed] *Crawford* error.'"]; *United States v. Chen* (2d Cir. 2004) 393 F.3d 139, 150.) Thus, the statements were not grounds for separate trials.

As for Johnson's other statements, the record shows that when he was at Ingrid's house before the shooting, he told Ngoc he was worried about Viet telling the police about the McDonald robbery. Johnson also told Ngoc and Viet to take Tam along with them on the purported drug run. Later that night, after the shooting, Johnson urged everyone to keep quiet about what happened and to come up with alibis. And when appellants met up at a park a few days later, Johnson talked about fleeing the state and the police having few clues about the murder. However, none of these statements were powerfully incriminating *on their face*. They may have served to corroborate Ngoc's testimony, but only when connected to other evidence in the case.

More importantly, because none of the statements were rendered in a formal setting in anticipation of trial they were not testimonial for purposes of the Sixth Amendment. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1065-1066; *People v. Valdez* (2013) 220 Cal.App.4th 16, 35-36; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1135-1136; *People v. Garcia* (2008) 168 Cal.App.4th 261, 287, 291.) Therefore, they did not implicate the principles enunciated in *Aranda/Bruton* or *Crawford*. (*Smith v. Chavez* (9th Cir. 2014) 565 Fed.Appx. 653; *United States v. Dargan* (4th Cir. 2013) 738 F.3d 643, 651; *United States v. Figueroa-Cartagena* (1st Cir. 2010) 612 F.3d 69, 85; *People v. Arceo* (2011) 195 Cal.App.4th 556, 571.)

In arguing separate trials were required, Tam and Giang also claim they were tarred by the evidence depicting Johnson's prior crimes and violent tendencies. However, during the course of the trial, evidence was adduced showing all four appellants had been involved in prior bad acts and gang activity, not just Johnson. And the trial court instructed the jurors this evidence was admissible only for noncharacter purposes, such as establishing motive or proving the existence of a conspiracy. The jury was expressly prohibited from using the evidence to conclude appellants were of poor

24

character or criminally inclined. The court and the parties also made it clear appellants' culpability had to be assessed on an individual basis and their association with one another was not a sufficient basis, in and of itself, to find them guilty.

For all of these reasons, the trial court did not abuse its discretion in denying appellants' severance motion. The court's decision did not render the trial fundamentally unfair in violation of *Aranda/Bruton*, *Crawford* or due process generally. (*People v. Garcia, supra,* 168 Cal.App.4th at pp. 281-282 [joint trial proper where codefendant's redacted confession only indirectly implicated defendant in charged crimes].)

### *Failure to Bifurcate the Gang Allegations*

In a related argument, Tam insists the gang allegations should have been tried in a bifurcated proceeding separate and apart from the trial on the substantive charges. Again, we disagree.

Trial courts have broad discretion in deciding whether to bifurcate gang allegations from the charged offenses. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048.) Typically, bifurcation is not required because, while the introduction of gang evidence always carries the potential for prejudice, such evidence is often relevant to "help to prove identity, motive, modus operandi, specific intent . . . or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. [Citation.]" (*Id.* at pp. 1049-1050.)

The gang evidence in this case included eight different episodes of criminal conduct by VFL members, ranging from car theft and gun possession to residential burglary and the botched home invasion robbery of McDonald and his mother. Tran does not dispute this evidence was relevant to prove VFL engaged in a pattern of criminal gang activity for purposes of the gang enhancement allegation. (See § 186.22, subd. (e).)

25

However, working on the assumption the connection between Viet's murder and VFL "was dubious," he contends the evidence was immaterial to the underlying charges and tarnished his right to a fair trial.

We cannot agree. The gang evidence was not only probative in terms of proving the gang allegations, it also shed considerable light on appellants' motive for murdering Viet. In fact, the prosecution theorized the botched home invasion robbery by VFL was the raison d'être for Viet's murder. According to the prosecution, VFL simply could not afford to have a "weak link" such as Viet in their ranks if they were to remain an effective criminal organization. Evidence of appellants' gang ties also helped explain why Tam would shoot Viet, even though Tam was not personally involved in the robbery. And such evidence was relevant to the conspiracy charge and to explain why some of the witnesses, including Ngoc and Binh, were reluctant to testify against appellants. It was just not possible to get a full and complete understanding of the case without explaining the underlying gang dynamics. Because the gang evidence was inextricably intertwined with the charged offenses, the trial court did not abuse its discretion in failing to bifurcate the gang enhancement allegations.

*Accomplice Issues*[16]

The trial court gave the jury extensive instructions on the law respecting accomplices. Among other things, it told the jurors the testimony of an accomplice requires corroboration, and it defined an accomplice as anyone who "is" subject to prosecution for the charged offenses as an aider or abettor or a coconspirator. Appellants challenge this definition. Because Ngoc was given immunity for his testimony, appellants contend Ngoc was not subject to prosecution *at the time of trial*, and therefore the court should have defined an accomplice as a person who "was" subject to

---

[16] Although Ngoc and Binh were both identified as potential accomplices, appellants' accomplice-related arguments center around Ngoc, presumably because he was the star witness for the prosecution.

prosecution for the alleged crimes. We agree but find the error was harmless under the circumstances presented in this case.

The correct time frame for determining whether a witness is subject to prosecution for the charged offenses, thus rendering him liable as an accomplice, is not at the time of trial but at the time the charged offenses were committed. (*People v. Gordon* (1973) 10 Cal.3d 460, 469; *People v. Wallin* (1948) 32 Cal.2d 803, 808.) The time frame was important here because Ngoc testified he received immunity in exchange for his grand jury and trial testimony. Based on this arrangement, the jury could have concluded Ngoc was not *currently* subject to prosecution for the charged offenses when he testified at trial, and therefore he was not an accomplice whose testimony needed to be corroborated.

The Attorney General argues that because Ngoc was only given use immunity, as opposed to transactional immunity, he was still technically subject to prosecution at the time of trial. (See generally *People v. Sutter* (1982) 134 Cal.App.3d 806, 813 ["Use immunity protects a witness only against the actual use of his compelled testimony and evidence derived directly or indirectly therefrom, while transactional immunity protects the person against all later prosecutions relating to matters about which he testifies."].) However, this distinction was never brought to the jurors' attention, let alone explained to them. It is doubtful they would have picked up on it. The distinction does not ameliorate the trial court's error in instructing the jury to assess Ngoc's liability at the time of trial.

Alternatively, the Attorney General contends the error was immaterial because there was not that much evidence implicating Ngoc as an accomplice in the charged offenses anyway. We beg to differ. Given that Ngoc drove the getaway car during the botched home invasion robbery he had a motive to kill Viet to keep Viet from implicating him in that crime. Additionally, the evidence revealed Ngoc was at Ingrid's party following the robbery, he was part of the ruse appellants used to get Viet in the van,

27

he was sitting next to Viet when he got shot, he was with appellants after the shooting, he threw his clothes away when he got home, he lied to the police about where he was at the time of the shooting, and he eventually fled the state. Besides proving Ngoc's substantial involvement in the events surrounding Viet's murder, this evidence shows Ngoc was a trusted associate of VFL. Although Ngoc testified he did not know Viet was going to be murdered, he was so immersed in the alleged crimes that it is highly unlikely the jury would have believed he was not liable for them at the time they occurred.

Still, even if the jury believed Ngoc was an accomplice, it would have been allowed to consider his testimony so long as it was sufficiently corroborated. (CALJIC No. 3.11.) Therefore, if the record contains enough evidence to corroborate Ngoc's testimony, the trial court's failure to give proper instructions on accomplice liability would be harmless error. (*People v. Miranda* (1987) 44 Cal.3d 57, 100; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 25.) In this regard, we must keep in mind, "The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone," and it "need not corroborate the accomplice as to every fact on which the accomplice testifies [citation] [or] establish every element of the charged offense [citation]." (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1022.) It will suffice if the corroborating evidence "tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth. [Citation.]" (*People v. Fauber* (1992) 2 Cal.4th 792, 834.)

At trial, nearly every material aspect of Ngoc's testimony was corroborated to some degree. His testimony Viet fled during the home invasion robbery was corroborated by Betty McDonald. His testimony Viet seemed worried at Ingrid's house after the robbery was corroborated by Linh Vu. His testimony Tam had Viet pull over on the side of the freeway before the shooting was corroborated by Lucia Carter and other witnesses who saw a van on the shoulder of the 405 freeway on the morning, and in the area, of the shooting. His testimony Tam shot Viet was corroborated by Ingrid, who

testified Tam told her he had to "take someone out." His testimony Tran picked him up along with Tam after the shooting was corroborated by Carter, who saw an Asian man running from the van to a waiting car as she passed by the area.[17] His testimony about spending the night at a motel with appellants following the murder was corroborated by the fact their motel room was registered to Linh Vu, whose brothers had close ties to Johnson and VFL. And his testimony Johnson assured everyone they had nothing to worry about based on a newspaper article about the shooting was corroborated by the fact the Orange County Register ran an article stating the police had few clues about Viet's murder. The sum and substance of this corroborative evidence connected appellants with the alleged crimes in such a way as to provide abundant basis for accepting Ngoc's testimony as truthful. Therefore, the flawed accomplice instruction is not cause for reversal.

For largely the same reason, we reject Johnson and Tam's claim that Ngoc's testimony was insufficiently corroborated to support the conclusion they were involved in Viet's murder. In addition to the corroborative evidence mentioned above, Johnson admitted to the police that he was involved in the botched home invasion robbery, that he talked to Viet later that night at Ingrid's house, and that he was perceived as the leader of VFL. During his police interview, Johnson also indicated Ngoc was sitting next to Viet when he was murdered, which is just how Ngoc described his position in the van. With respect to Johnson, these statements further bolstered the credibility of Ngoc's testimony. The corroborative evidence was more than sufficient to justify the jury's belief Ngoc was telling the truth, despite his being an accomplice to the crimes in question.[18]

---

[17] The fact Carter described the waiting car as white and Ngoc said it was light green strikes us as being a minor discrepancy considering the incident occurred in the middle of the night. At trial, appellants argued the waiting car belonged to Ngoc, but his car had two doors, and Carter testified the car she saw had four doors, which was consistent with Ngoc's testimony.

[18] Appellants challenged the sufficiency of the corroborative evidence at the end of the prosecution's case-in-chief pursuant to section 1118.1 and in moving for a new trial under section 1181. Tam contends the trial court used the wrong standard in assessing his section 1118.1 motion by applying the substantial evidence test that is

*Evidentiary Issues*

Appellants raise a variety of claims about the admissibility and sufficiency of the evidence presented against them. We address these claims in turn.

1. Admissibility of letters suggesting Johnson was VFL's leader

In order to support its theory Johnson led VFL and ordered Viet's murder, the prosecution introduced two letters found in the home of VFL member Noel Plata during an unrelated investigation in 1996. Johnson argues the letters should have been excluded because they were not properly authenticated, they constituted inadmissible hearsay, and their admission violated his Sixth Amendment and due process rights.[19] We find the letters were properly admitted into evidence.

The first letter was written by Plata to former VFL member Tam Thanh Nguyen in 1993.[20] It is peculiar because when Plata penned it, Tam Thanh was deceased, having been killed in 1992, so it may be more of a purging exercise than an actual missive. In the letter, Plata seeks Tam Thanh's help and guidance with respect to various issues going on with VFL. Plata expresses particular concern about the fact Johnson is trying to get him kicked out of VFL for "ratting on him." After expressing his regret for implicating Johnson, Plata tells Tam Thanh, "All I'm asking is that you let [the VFL gang members] change their mind about jumping me out and you let this thing with me and [Johnson] go by without any problems[.]" In the letter, Plata also pledges his support for VFL and promises Tam Thanh he "would never rat on anyone again now that [he] know[s] how the cops do things."

The second letter was written from VFL member Ronald Tran to Plata in April 1995, shortly after Viet's murder.[21] Speaking to Johnson's role in VFL, Ronald

applicable on appeal. However, that is actually the correct standard for a section 1118.1 motion. (*People v. Stevens, supra*, 41 Cal.4th at p. 200.) In applying that standard, the trial court did not abdicate its duty to independently assess the strength of the prosecution's evidence.

[19] Tran joins these arguments, as well as all of the other claims Johnson raises on appeal.

[20] We will refer to Tam Thanh Nguyen as Tam Thanh to differentiate him from appellant Tam Nguyen.

[21] We will refer to Ronald Tran as Ronald to differentiate him from appellant Truc Tran.

wrote, "So what's this about [Johnson] being shot-caller? So what? If he won't then who will? Cause if no one leads the way, then those little youngsters will get into even more trouble, especially stupid shit. Even though [Johnson] isn't exactly my top choice to play leader there's nobody out that's been around long enough to know what's up, except E.T., Quoc, you and a few others[.]"

Finding the letters more probative than prejudicial, the trial court allowed gang expert Nye to rely on them in forming his opinion about the case. Nye opined that "ratting" can have severe consequences for gang members and that Johnson was a prominent member of VFL who had the juice to order the hit on Viet.

In admitting the letters into evidence, the court instructed the jurors they could not consider them for the truth of the matters asserted therein. Rather, they were only admissible as evidence of the basis for Nye's opinions. Additionally, if the prosecution failed to prove the statements in the letters were actually made or true, the jury could consider that in deciding what weight to accord Nye's opinions.

Notwithstanding these instructions, Johnson contends the prosecutor should have called Plata or Ronald (the purported authors), or at least someone who was familiar with their handwriting, to authenticate the letters. However, the state was not required to do so, since a writing may be authenticated by any evidence showing it is the writing the proponent of the evidence claims it is. (Evid. Code, §§ 1400, 1410, 1411.) "Circumstantial evidence, content and location are all valid means of authentication." (*People v. Gibson* (2001) 90 Cal.App.4th 371, 383.) A writing may even be authenticated by showing it refers to matters that are unlikely to be known by anyone other than the claimed author. (Evid. Code, § 1421.)

The letters at issue here were found in Plata's house. They are signed, respectively, in the names of "Noel" and "Ron Tran," signifying the purported authors, and each of the letters references matters that are unlikely to be known by anyone else, or at least anyone outside VFL. For instance, Plata talks about the anguish he has

31

experienced as a result of ratting on appellant and how that has caused dissension in the gang. And Ronald not only offers his advice about who he thinks could lead VFL, he asks if Johnson is still in Texas, which is where he fled after the shooting. All told, there was sufficient evidence to show the letters were authentic.

Johnson also complains that, when the letters were offered into evidence, "No exception to the hearsay rule was propounded by the prosecution and none was required by the court." However, that's because the letters were not offered for the truth of their contents, but instead were simply used as foundational information for the gang expert's opinions. Since the letters were not offered for their substantive truth, they were not hearsay under California law. (Evid. Code, §§ 1200, subd. (a) [hearsay rule] & 801, subd. (b) [permissible basis for expert testimony].)

This conclusion is supported by our Supreme Court's opinion in *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), which upheld the practice used here of allowing a gang expert to rely on and reveal to the jury the contents of otherwise inadmissible evidence in stating his opinions about the case. (*Id.* at pp. 618-619.) While some courts have questioned *Gardeley*'s assumption that basis evidence for expert testimony is not admitted for its truth, we are not at liberty to reexamine this issue. (See *People v. Hill, supra,* 191 Cal.App.4th at p. 1131 [postulating that *Gardeley*'s assumption in this regard may be incorrect, but holding the "judicial hierarchy" that exists among state courts requires intermediate appellate courts to follow that decision].)[22]

Even if the jury failed to heed the court's limiting instructions and considered the letters for their substantive truth there was no violation of the confrontation clause because the letters were not testimonial in nature, i.e., they were not composed in a formal setting in anticipation of trial. Rather, they reflect informal

---

[22] The California Supreme Court is currently considering whether *Gardeley* comports with current trends respecting the Sixth Amendment's Confrontation Clause. (See *People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014, S216681 and *People v. Archuleta* (2014) 225 Cal.App.4th 527, review granted June 11, 2014, S218640.)

communications between gang members that took place outside the context of a criminal investigation. Therefore, no Sixth Amendment violation occurred. (*People v. Lopez, supra,* 56 Cal.4th at pp. 1065-1066; *People v. Valdez, supra,* 220 Cal.App.4th at pp. 35-36; *People v. Hill, supra,* 191 Cal.App.4th at pp. 1135-1136; *People v. Garcia, supra,* 168 Cal.App.4th at pp. 287, 291.)

Turning to Johnson's due process argument, he contends the letters rendered his trial fundamentally unfair because they did not support Nye's opinion that he (Johnson) had the power to order the hit on Viet. But in the letter written by Ronald, he alluded to Johnson as a "shot caller" for VFL and surmised Johnson was one of the few people who had the chops to lead the gang. And in the other letter, Plata made clear he was facing the prospect of expulsion from VFL for ratting on Johnson. This evidence shows Johnson's prominence and pull within the gang. It was certainly probative of whether he called for Viet's murder, which was a central issue in the case. Moreover, because the prosecutor used the letters as basis evidence, as opposed to character evidence, they were not likely to have a blinding effect on the jury. We conclude the letters did not undermine Johnson's constitutional right to a fair trial. The trial court did not err in admitting the letters into evidence and allowing the prosecution's gang expert to rely on them in forming his opinions.

But even were we to conclude otherwise, reversal would not be required because, irrespective of the letters found in Plata's home, there was considerable evidence Johnson was the leader of VFL. Nye, for one, testified that, separate and apart from the letters, his vast experience investigating VFL's activities and talking to its members led him to believe Johnson was VFL's leader. This belief was shared by Ngoc and Binh, who described Johnson as being forceful, dominant and having "a leadership aura about him." Even Johnson himself admitted to the police that people perceived him as the leader of VFL. And, of course, Johnson's actions surrounding Viet's death also support the conclusion he called the shots for the gang. Thus, assuming the court erred in

33

admitting the subject letters into evidence, the error was harmless. It is simply not reasonably probable Johnson would have obtained a more favorable result had the letters been excluded. (*People v. Watson* (1956) 46 Cal.2d 818.)

2. Foundation for the prosecutor's hypothetical questions to Nye

At trial, the prosecutor utilized hypothetical questions to elicit Nye's opinion about whether the charged offenses were committed for the benefit of a gang. The questions asked Nye to assume a new gang member was murdered at the direction of his gang's leader and that the murder was carried out in the manner Ngoc described at trial. Johnson claims the questions lacked adequate evidentiary support, but that is not the case. Indeed, we can give this claim short shrift because it is based on the erroneous assumption the letters found in Plata's home were improperly admitted into evidence and Ngoc's testimony was not sufficiently corroborated. As we have explained above, those assumptions are incorrect.

Johnson also contends the hypothetical questions were faulty to the extent they relied on the testimony of Binh, whom Johnson describes as an uncorroborated accomplice. However, there was no evidence implicating Binh in the planning or execution of Viet's murder. Binh did make up an alibi with Ngoc following the murder, but he did so at Johnson's direction to cover for Ngoc. Because the evidence did not establish Binh was liable for the crimes charged against appellants, he was not an accomplice whose testimony required corroboration. As such, there is no basis for impugning the foundation of the prosecutor's hypothetical questions to Nye, and his opinions were properly admitted into evidence.

3. The pistol-whipping incident

Johnson next asserts the trial court erred in admitting evidence he had previously committed the crime of assault with a firearm. He contends the evidence, which came in during Ngoc's testimony, constituted inadmissible character evidence, but we find it was properly admitted to show Ngoc's fear of Johnson.

34

At trial, Ngoc said he was not comfortable testifying against Johnson because Johnson could be very intimidating. Defense counsel questioned Ngoc's fear of Johnson and got him to admit on cross-examination that Johnson was always nice to him. That prompted the prosecutor to elicit the evidence in question. In order to show Ngoc's fear of Johnson was genuine, the prosecutor asked him about an incident that occurred at a party about a month before Viet was murdered. Ngoc recalled that after someone at the party gave Johnson a funny look, Johnson took out a gun and hit him in the head with the weapon. Then Johnson pointed the gun around, and everyone at the party fled. The trial court instructed the jury this incident was admissible only against Johnson and only to the extent it pertained to the credibility of Ngoc's claim that he was afraid of Johnson.

Johnson argues the incident was irrelevant because it did not logically bear upon whether Ngoc was fearful of him. But the fact Ngoc witnessed Johnson pistol whip another person for simply looking at him the wrong way could easily lead Ngoc to believe that Johnson had a very short temper and that he was not the least bit afraid to use violence in the face of a perceived slight. It's hard to imagine that anyone who witnessed the pistol-whipping incident would not be affected by the disproportionality and brazenness of Johnson's conduct.

And the evidence was not unduly prejudicial because it was accompanied by a limiting instruction, and there was a plethora of other evidence implicating Johnson in more serious criminal behavior. Given all these considerations, the trial court did not abuse its discretion in allowing Ngoc to testify about the pistol-whipping incident. (*People v. Hawkins* (1995) 10 Cal.4th 920, 951-952, abrogated on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110 [evidence of the defendant's prior bad acts was properly admitted to rehabilitate the credibility of a reluctant witness].)

4. Photographs of Viet's body

Tam argues the trial court erred in allowing the prosecution to present photographs of the murder scene and Viet's gunshot wounds to the jury. He contends the

photos were "gruesome" and "served no purpose other than to inflame the emotions of the jurors," but we find they were properly admitted into evidence.

"""The admission of allegedly gruesome photographs is basically a question of relevance over which the trial court has broad discretion." [Citations.] The further decision whether to nevertheless exclude relevant photographs as unduly prejudicial is similarly committed to the trial court's discretion: "A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value."' [Citations.]" (*People v. Duff* (2014) 58 Cal.4th 527, 557.)

At trial, there was no dispute Viet died from two gunshot wounds to the back of the head. However, there was considerable disagreement about the circumstances surrounding the shooting and how it played out. And, of course, the identity of the shooter was in dispute. Since Ngoc was the only trial witness who actually saw Viet's murder, the defense critically examined his account of the shooting. They wanted to know exactly where everyone in the van was sitting as the shooting unfolded and why Ngoc's door was open when the second shot was fired. The suggestion was that Ngoc was in on the shooting and that he concocted his version of events to avoid prosecution.

Consequently, the prosecutor spent a considerable amount of time establishing through various investigators how the shots were fired and what direction they took. In this process, the prosecutor utilized several exhibits that were marked for identification, including photos that were taken of Viet at the murder scene and during the course of his autopsy. They showed Viet's bullet wounds and how metal probes were put through his head to determine bullet trajectory. They also depicted blood splatters and human flesh that were found on the door next to the front passenger seat of Viet's van.

36

In response to a defense objection to the photographs, the prosecutor withdrew two of them, and the court excluded several more, which it described as "some of the more bloody, graphic photographs." The court felt the remaining photos were more probative than prejudicial and admitted them into evidence.

Given that Ngoc's testimony about how the shots were fired was hotly contested at trial, the court's ruling was not unreasonable. The photographs were relevant to corroborate Ngoc's version of events, and both the prosecutor and the court took steps to ensure the jury would not be exposed to photographic carnage unnecessarily. However, the reality is that in cases like this, where the underlying crime is horrifically violent, it is virtually impossible to shield the jury from all unpleasant images. We discern no abuse of discretion in the court's handling of the photographic evidence.

5. <u>The gang enhancement</u>

Johnson argues there is insufficient evidence Viet was murdered for gang-related purposes as opposed to personal ones. That is not the case.

Johnson's argument is focused on the sufficiency of the evidence at the end of the prosecution's case-in-chief. In particular, he contends the trial court should have granted his motion for acquittal on the gang enhancement allegation at that point in the case. (§ 1118.1.) As noted above, "'The standard applied by a trial court in ruling upon a motion for judgment of acquittal [under that section] is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense [or enhancement] charged."' [Citation.] . . . The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.' [Citation.]" (*People v. Stevens, supra,* 41 Cal.4th at p. 200.)

Section 186.22, subdivision (b)(1) authorizes a sentence enhancement when the defendant "is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members[.]" Although the enhancement applies only when the underlying crime is "gang related" (*Gardeley, supra,* 14 Cal.4th at p. 622), and "[n]ot every crime committed by gang members is related to a gang" (*People v. Albillar* (2010) 51 Cal.4th 47, 60), we believe there is substantial evidence the crimes in this case were committed for the benefit of a gang.

In arguing otherwise, Johnson does not dispute that Viet's murder had all the trappings of a gang-style hit and that gang expert Nye opined the murder benefited VFL by eliminating a "weak link" in the gang's operating force. But in Johnson's mind, none of that matters because – notwithstanding any benefit that may have inured to VFL by virtue of Viet's murder – the crime also benefited him on a *personal level* because it led to the death of a witness who could have implicated him in the botched home invasion robbery.

We do not dispute Johnson may have had multiple motives for getting rid of Viet. But on appeal we do not reweigh the evidence or attempt to ascertain which interpretation of the evidence is more viable; that is the function of the jury. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.) Instead, we must simply decide whether, under any hypothesis whatsoever, there is substantial evidence to support the judgment below. (*People v. Cravens* (2012) 53 Cal.4th 500, 508.) The fact the various circumstances can be reconciled with a contrary finding does not warrant reversal. (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.)

That being the case, Johnson's attack on the sufficiency of the evidence cannot prevail. The prosecution's evidence demonstrated Viet's murder was carried out to eliminate a member of VFL who was not up to snuff in terms of carrying out one of the gang's primary criminal activities – home invasion robbery. Indeed, the jury could

reasonably conclude appellants murdered Viet in the belief his absence would allow the gang to operate more effectively. That potential benefit was clearly articulated by gang expert Nye in his testimony.

Johnson correctly notes there was evidence indicating he caught flak about Viet's murder from the Los Angeles chapter of VFL, which apparently had a certain amount of control over appellants' gang. Johnson argues this shows the murder was not authorized by the chain of command, and thus it could have only brought him and VFL problems. This establishes only that others disagreed about whether the murder was a good choice for the gang, not that it was not committed for gang purposes.

But even if the "benefit" prong of the gang enhancement was not satisfied, it is clear Viet's murder was carried out "at the direction of" and "in association with" a criminal street gang for purposes of section 186.22, subdivision (b). In that regard, the jury could conclude Johnson put the murder plan in motion by sending Viet, Tam and Ngoc off on a phony drug run and that Tam, aided by Tran, carried out the plan by shooting Viet on the side of the road. Moreover, by working together and observing Johnson's admonition to keep their mouths shut, appellants managed to avoid apprehension for over a decade. All of this shows gang coordination and cooperation. The combined circumstances of the case were amply sufficient to support a true finding on the gang enhancement allegation. (*People v. Albillar, supra,* 51 Cal.4th at pp. 59-68.)

6. Ngoc's refusal to take a polygraph test

When Ngoc was interviewed by the police in 2008, he refused the officers' request to take a lie detector test. Johnson claims the trial court violated his confrontation rights by not letting him cross-examine Ngoc as to *why* he refused to take the test. However, the law prohibits inquiry into such matters.

"Evidence Code section 351.1 provides that the results of a polygraph examination 'shall not be admitted into evidence in any criminal proceeding . . . unless all parties stipulate to the admission of such results.' The statute also excludes evidence of

'an offer to take' or the 'failure to take' such a test." (*People v. Espinoza* (1992) 3 Cal.4th 806, 816.) The basis for this exclusionary rule is the lack of reliability of polygraph results. Although the admissibility of polygraph results was not at issue in this case (since Ngoc refused to take a polygraph test altogether), this rationale also explains why the trial court was correct in precluding Johnson's attorney from questioning Ngoc about *why* he refused to take a polygraph test: "[B]ecause lie detector tests themselves are not considered reliable enough to have probative value, 'a suspect's willingness or unwillingness to take such a test is likewise without enough probative value to justify its admission. The suspect may refuse to take the test, not because he fears that it will reveal consciousness of guilt, but because it may record as a lie what is in fact the truth. A guilty suspect, on the other hand, may be willing to hazard the test in the hope that it will erroneously record innocence, knowing that even if it does not the results cannot be used as evidence against him.'" (*People v. Thornton* (1974) 11 Cal.3d 738, 764, overruled on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12.)

Despite the applicability of Evidence Code section 351.1's exclusionary rule in this case, Johnson argues the rule should have been suspended to accommodate his constitutional right to confront his accusers. Our Supreme Court has consistently rejected this argument. (*People v. Richardson* (2008) 43 Cal.4th 959, 1032-1033; *People v. Wilkinson* (2004) 33 Cal.4th 821, 849-850; *People v. Burgener* (2003) 29 Cal.4th 833, 870-871.) The argument assumes the right of confrontation is absolute, when in fact judges retain wide discretion to impose reasonable limits on cross-examination. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679; *Delaware v. Fensterer* (1985) 474 U.S. 15, 20.)

It is important to keep in mind as well that, even though the trial court precluded questioning about why Ngoc refused to take a polygraph test, that did not prevent defense counsel from rigorously cross-examining him. As a matter of fact, Ngoc faced intense questioning about his immunity agreement with the prosecution, his

numerous false statements and his past criminal behavior. The trial court even had to admonish defense counsel to tone down their attack on Ngoc at several points during his cross-examination. Suffice it to say, the jury would not have been left with a significantly different impression of Ngoc's credibility had the court allowed further questioning about his motive for not taking a lie detector test. The absence of such questioning is not cause for reversal. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1051; *People v. Frye* (1998) 18 Cal.4th 894, 946, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Quartermain* (1997) 16 Cal.4th 600, 623-624.)

*Alleged Prosecutorial Misconduct*

Appellants contend the prosecutor engaged in multiple instances of prejudicial misconduct during the trial. We do not see it that way.

1. <u>General principles</u>

As the representative of the government in a criminal case, "'It is a prosecutor's duty "to see that those accused of crime are afforded a fair trial." [Citation.]'" (*People v. Daggett* (1990) 225 Cal.App.3d 751, 759.) A prosecutor "may strike hard blows, [but] he is not at liberty to strike foul ones." (*Berger v. United States* (1935) 295 U.S. 78, 88; *People v. Garcia* (2014) 229 Cal.App.4th 302, 316-317.) "Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' in attempting to persuade either the trial court or the jury, and when it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] And under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights . . . but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" [Citation.]" (*People v. Rundle* (2008) 43 Cal.4th 76, 157, disapproved on other grounds in *People v. Doolin,*

41

*supra,* 45 Cal.4th at p. 421, fn. 22.) We apply these considerations in resolving the issues raised here.

2. Alluding to inadmissible evidence

The first instance of alleged misconduct centers on the questioning of prosecution witness Linh Vu, who not only talked to Viet at Ingrid's party but also spoke with Johnson and the police in the wake of Viet's murder. On direct examination, Vu testified that once he learned Viet had been shot in the back of the head, he did not believe appellants' claim that Viet was killed in a drug deal. He also testified he did not express his suspicions about Viet's death to anyone. But that was not true. When the police interviewed Vu after Viet was killed, he said he had told members of the Los Angeles chapter of VFL that appellants may have been behind Viet's murder. However, when the prosecutor tried to impeach Vu with his police statement, the defense objected and the court expressed concern Vu's statement was irrelevant and unduly speculative. Yet the court did give the prosecutor permission to elicit evidence that Vu had talked to the Los Angeles members more generally about the need to find out who murdered Viet.

When Vu's testimony resumed, the prosecutor asked him why he never told the police his suspicions about who killed Viet. Vu claimed he simply did not know enough about the matter, to which the prosecutor responded, "Well, you were bothered enough when you found out that Johnson was lying to you [about how Viet was killed] you talk[ed] to . . . [the Los Angeles members] about it; right?" When Vu answered no, the prosecutor impeached him by reading excerpts of Vu's interview with the police. In one of the excerpts, Vu alluded to talking to the Los Angeles members about his suspicions and telling them that if someone in appellants' gang had killed Viet, they "better find out who did it."

As he did at trial, Tam claims this was improper impeachment because the trial court had previously ruled this line of questioning out of bounds. However, as explained above, the trial court did allow the prosecutor some leeway in this area. We

agree with the trial court's assessment that Vu's impeachment did not contravene the court's prior ruling. In any event, any misconduct that occurred was cured because, in an abundance of caution, the trial court ended up striking the questions and answers that formed the basis for Vu's impeachment. No prejudice inured to Tam under these circumstances.

3. Referencing the fate of other VFL members

Appellants also assign misconduct to the prosecutor's comments in rebuttal argument regarding VFL members Terry Tackett and Philip Dang, who were killed after Viet was murdered. The prosecutor referred to their deaths in attempting to explain why Ngoc was reluctant to turn state's evidence. Here is what the prosecutor said in that regard: "Now, the defense pooh-poohed Ngoc Nguyen being afraid to testify in court or to implicate these defendants to the police when they were interview[ing him]. Oh, it's laughable, isn't it? It's not laughable. What do we know? Well, we know that somebody shot and killed Viet Nguyen after he botched this robbery and was talking about having participated in it at school. We know that. Is that a joke?

"Okay. We know that Phillip Dang, the guy who introduced Ngoc into VFL – we don't know the precise circumstances, but we know he was VFL. He is the guy who found a place for Johnson to stay in Texas. [¶] Go back to Johnson's March 30th interview, 1995. Phillip Dang gets murdered. That's this small sect of VFL. There's two people already who were murdered. Okay. Is that a joke?

"Is Ngoc's fear of being killed a joke? Well, [Sergeant] Rudisill, when he goes back to interview [Ngoc] in 2008, he doesn't do it intentionally, but he inadvertently says, oh, yeah, we talked to Tackett, and Tackett was telling us some stuff. And oh, yeah, Tackett got murdered, by the way. Oh, it's totally unrelated, [Ngoc]. Don't worry about it. [¶] So he is telling him right at the beginning of this interview, in effect, in case you forgot, another VFL guy got murdered after giving information to the police. Do you

think that put Ngoc's mind at ease about testifying in the case? He is scared out of his mind and for good reason."

Appellants claim that while there was evidence Tackett and Dang were killed in gang-related matters,[23] the prosecutor's remarks were improper because there was no evidence they were killed specifically because they provided information to the police. Appellants take particular umbrage to the prosecutor referencing Rudisill's statements to Ngoc about Tackett's murder, since those statements were the basis for the prosecutor's argument Tackett was murdered for ratting on VFL. Appellant's suspect if the jurors bought into this argument, then they would be more inclined to go along with the prosecution's theory appellants killed Viet to prevent him from becoming a stool pigeon.

However, it is clear from the above-quoted passage that the prosecutor did not use Rudisill's statement as direct evidence of appellants' guilt. Rather, he merely tried to explain why Ngoc might be reluctant to implicate appellants in criminal activity. Furthermore, the trial court gave two instructions to ensure the jury did not misuse Rudisill's statements for any other purpose. First, with respect to police interviews in general, the court instructed the jury not to consider anything the interviewing officers said for the truth of the matter asserted. And second, the court told the jury not to consider the particular statement Rudisill made to Ngoc about Tackett's death for its truth, but only for how it might have affected Ngoc's state of mind.

This was a reasonable approach because Ngoc's knowledge of the fact Tackett may have been murdered for providing information to the police logically pertained to whether Ngoc was telling the truth when he was interviewed before trial and when he was questioned in court. Because the prosecutor's argument was geared toward Ngoc's credibility, and not appellants' character or culpability, it was not improper.

---

[23]     Ngoc made statements to this effect both during his pretrial police interview and at trial.

44

### 4. Failing to heed limiting instruction

Giang and Tran assert the prosecutor improperly argued Giang drove Johnson to the airport when Johnson left for Texas. The argument was based on Johnson's statement to the police that he got a ride to the airport in the car of Giang's girlfriend Tammy Phan. Since Phan was in jail at that time, and Giang admitted he drove Phan's car when she was in custody, it was reasonable to infer Giang is the one who drove Johnson to the airport, as the prosecutor argued.

The problem is, the trial court admitted Johnson's statements solely against him. So by using Johnson's statement to argue Giang was the one who took Johnson to the airport, the prosecutor failed to adhere to the limiting instruction. However, Giang's alleged role in taking Johnson to the airport after the murder was a miniscule part of the prosecution's case against him. That information paled in comparison to the other evidence that was properly admitted against Giang. The great bulk of the evidence not only implicated Giang in the botched home invasion robbery and the plan to kill Viet, it also suggested he let Tran use Phan's car to pick up Tram and Ngoc following the shooting. Of course, Giang was also with appellants at the motel room after the murder and when they met up later on to discuss their alibis and flight plans. Thus, even if the prosecutor had not alluded to Giang taking Johnson to the airport, it is exceedingly unlikely Giang would have received a more favorable verdict. Because of this, and because the challenged statements did not render the trial fundamentally unfair, they are not cause for reversal.

### 5. Alleged *Griffin* error

Continuing his critique of the prosecutor's closing argument, Tam contends the prosecutor improperly commented on his failure to testify. However, what the prosecutor actually said was that *Tam's attorney* did not do a very good job of explaining or addressing the issues that he (the prosecutor) brought up during his initial closing argument. In this regard, the prosecutor noted there was "[n]o discussion whatsoever

about why Tam, in the spring of 1995, suddenly has to go to Texas. No explanation whatsoever." Tam sees this as a violation of the *Griffin* rule, which prohibits the prosecutor from drawing negative inferences from the accused's failure to take the stand. (See *Griffin v. California* (1965) 380 U.S. 609.) But the rule does not prohibit the prosecutor from commenting on the state of the evidence or the defendant's failure to introduce material evidence or call logical witnesses. (*People v. Hovey* (1988) 44 Cal.3d 543, 572.) Rather, the rule is violated only when the prosecutor alludes to the absence of evidence that can only be provided by the defendant himself. (*People v. Hughes* (2002) 27 Cal.4th 287, 372.)

That did not happen here. Tam's girlfriend Ingrid testified about the fact that she and Tam moved to Texas following the shooting. Therefore, she was in a good position to explain why the move occurred. Because Tam was not the only person who could have provided an explanation in this regard, the prosecutor did not commit *Griffin* error. (*People v. Murtishaw* (1981) 29 Cal.3d 733, 757, fn. 20.) His allusion to the lack of defense evidence explaining the move – his comment that Tam's *counsel* had not explained it – was a fair comment on the state of the evidence and did not violate Tam's right against self-incrimination.

Tam also contends the prosecutor committed misconduct by eliciting the fact Linh Vu invoked his right not to testify when he was called as a witness. (See Evid. Code, § 913, subd. (a); *People v. Padilla* (1995) 11 Cal.4th 891, 948, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) The Attorney General does not dispute this contention but argues the misconduct was harmless because the line of questioning about Vu invoking his right against self-incrimination helped the defense by undermining Vu's credibility. Indeed, as the Attorney General correctly notes, Tam's attorney specifically objected to the trial court admonishing the jury not to draw any adverse inferences from Vu's decision to invoke the Fifth. (See Evid. Code, § 913, subd.

(b).) Under these circumstances, Tam has no right to complain about the alleged misconduct.

6. Appealing to the passion and prejudice of the jury

Appellants aver the prosecutor improperly attempted to garner sympathy for Viet and his family. They point out that during opening statements the prosecutor described Viet as a good student who attended church, played sports and was well liked. And during closing argument, the prosecutor portrayed Viet as an innocent kid who got swept up in appellants' gang. After characterizing Viet in these terms, the prosecutor told the jurors "it's not the judge who has the power. It's not the prosecutor. It's not the defense attorneys. It's you. You have the power in this case to do justice. [¶] There's only one power that you do not have. You do not have the power to bring [Viet] back to life."

These remarks prompted a mistrial motion by Tam's attorney, but the court denied the motion and allowed the prosecutor to proceed. He finished his closing argument by telling the jurors, "The one thing that you don't have the power to do is you cannot bring [Viet] back from the dead and return him to his mother. The only thing you have the power to do is bring her justice. The only thing you can do – and it's not for sympathy. It's because that woman deserves justice in this case. Justice in this case is holding these men responsible. So do your duty."

Outside the presence of the jury, Tam's attorney renewed his motion for a mistrial, arguing the prosecutor's final argument amounted to "an unreasonable appeal to emotion." In so arguing, Tam's attorney alleged the prosecutor "was attempting to cry during his very final remarks [but he] doesn't appear to be very upset and crying right now." Giang's attorney joined the motion, noting the prosecutor was holding a photograph of Viet when he made his final remarks and some members of the audience were crying at the time.

47

However, the court did not believe there were grounds for a mistrial. The court did recognize that emotions on both sides had been running high during the trial and that during closing argument the prosecutor "hesitated in his speech and his voice cracked slightly." But the court observed there were no "tears rolling down [the prosecutor's] cheek or anything like that. It was nothing of that sort." The court also put the prosecutor's remarks in context by noting they came after, and in apparent response to, defense counsel's insinuation Viet's parents were aloof and uncaring.[24] The court simply did not believe the challenged remarks were inappropriate given the totality of the circumstances.

Still, to be on the safe side, the court told the jury to disregard any pleas to sympathy, passion or "doing justice for the family[.]" The court said "that's something that . . . you don't consider. Obviously, it's emotional, but you don't consider that. There's been some anger expressed at the family. You don't consider that. [¶] You know, we're not here to be mad at the family or [feel] sorry for the family. I know it's in human nature to do things like that, but you leave that out of your deliberations." A few moments later, the court gave CALCRIM No. 200, which reiterated to the jurors they had to base their decision on the facts and the law and not be influenced by sentiment, sympathy, passion or prejudice.

While a prosecutor is "entitled to present his argument in colorful terms[]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1179), the prospect of misconduct arises whenever a prosecutor invokes sympathy for the victim or his family. Such appeals are usually "out of place during an objective determination of guilt. [Citation.]" (*People v. Jackson* (2009) 45 Cal.4th 662, 691.) However, in alluding to the victim's mother in this case, the prosecutor was trying to tap into the jurors' sense of justice, not their sympathy.

---

[24] In that regard, Tam's attorney stated, "And I'll tell you one other thing, and I'll tell it to Mr. and Mrs. Nguyen (Viet's parents). When my teenagers were in high school at Mater Dei, I knew where they were every second. [¶] So, Mr. Prosecutor, don't you dare blame me for Viet Nguyen's bad decisions and the bad decisions of the mother and father Nguyen."

And even though there was no need for the prosecutor to hold up a picture of Viet or to get overly emotional in order to get his points across, the context of his remarks does make them less objectionable. Considering as well that the trial court repeatedly admonished the jury to disregard the subject remarks and not base its decision on passion, prejudice or emotion, we do not believe the remarks rendered appellants' trial unfair. Nor is it reasonably probable appellants would have obtained a more favorable result had they not been uttered. Therefore, they do not warrant reversal. (*People v. Rundle, supra,* 43 Cal.4th at p. 157.)[25]

*Lying-in-Wait Special Circumstance*

Claiming the lying-in-wait special circumstance applies only to the direct perpetrators of murder, Tran, Giang and Johnson contend the circumstance is inapt as to them because they were convicted on aiding and abetting and conspiracy principles. That is plainly not the case.

Section 190.2 states, "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found" true. (§ 190.2, subd. (a).) Among the circumstances listed in this section is that the "defendant intentionally killed the victim by means of lying in wait." (*Id.*, at subd. (a)(15).) Because these provisions reference only the defendant, and not accomplices, Tran, Giang and Johnson contend they only apply to the actual perpetrator of the offense, i.e., the person who killed the victim while lying in wait.

However, these provisions cannot be read in isolation. Rather, they must be considered in light of section 190.2, subdivisions (c) and (d), which prescribe death or LWOP for any person who is "not the actual killer" if he aids and abets a special

---

[25] Tam also faults the prosecutor for asking the jurors to put themselves in Viet's shoes on the night of the murder. In attempting to illustrate how hard it would be for Ngoc to remember every detail about the shooting, the prosecutor did attempt to utilize a hypothetical in which one of the jurors suddenly shot another juror in the back of the head. However, after the trial court sustained an objection to this argument, the prosecutor quickly pivoted away from it and told the jury to "scratch that hypothetical." We do not believe that is cause for reversal.

circumstances murder while harboring the intent to kill, or he acts with reckless indifference to human life during the commission of a felony murder. As our Supreme Court has stated, these subdivisions extend the reach of the special circumstances law beyond the actual perpetrator to include "certain aiders and abettors of first degree murder. [Citation.]" (*People v. Banks* (2015) 61 Cal.4th 788, 797-798; accord, *People v. Bonilla, supra,* 41 Cal.4th at p. 331; *People v. Cleveland* (2004) 32 Cal.4th 704, 729, 756; *People v. Estrada* (1995) 11 Cal.4th 568, 572; *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1085-1086.) We cannot ignore them.

Appellants draw our attention to cases from other jurisdictions that have limited the reach of their special circumstances statutes to actual killers. (See, e.g., *Commonwealth v. Lassiter* (Pa. 1998) 722 A.2d 657; *Johnson v. State* (Tenn. 2001) 38 S.W.3d 52; *Young v. Commonwealth* (Ky. 2001) 50 S.W.3d 148.) However, these cases are readily distinguishable because they arose in states that do not have statutes permitting vicarious application of the special circumstance provisions. Because California law does extend its special circumstances to aiders and abettors and coconspirators, the lying-in-wait special circumstance was applicable with respect to Tran, Giang and Johnson, even though they did not personally kill Viet.[26]

### Tran's Sentencing Claims

The trial court sentenced Tran to the principal term of LWOP on the murder count and 25-years-to-life on the conspiracy count. The court also imposed a 10-year gang enhancement on those counts. Although the court stayed the conspiracy sentence and the gang enhancements, there are two undisputed problems with Tran's sentence.

First, the trial court failed to take into consideration the fact that, unlike his partners in crime, Tran was a minor – only 17 – when Viet was murdered. The parties

---

[26] In so holding, we also reject appellants' subsidiary argument that retroactive application of judicial decisions applying the lying-in-wait special circumstance to nonkillers violates the Fourteenth Amendment. Since our conclusion about their culpability is based on the language of the special circumstances statute itself, as opposed to any particular judicial decision, retroactivity is simply not an issue in this case.

agree that, pursuant to *People v. Gutierrez* (2014) 58 Cal.4th 1354 and *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455], Tran is entitled to resentencing on the murder count, so the court can consider how the attributes of youth generally make the imposition of a LWOP sentence unsuitable for juvenile offenders in deciding whether to sentence him to LWOP or 25 years to life on that count.  (See § 190.5, subd. (b).)

The state also agrees the trial court erred in imposing the 10-year gang enhancement.  Section 186.22, subdivision (b)(1)(C) does currently authorize a 10-year enhancement when the defendant is convicted of committing a violent felony, such as murder or conspiracy to commit murder, for the benefit of a criminal street gang.  However, that provision did not exist when this case arose in 1995, and therefore ex post facto principles preclude its application in this case.  (See generally *John L. v. Superior Court* (2004) 33 Cal.4th 158, 172-173 [ex post facto principles "allow individuals to rely on existing penal statutes, and to avoid being unjustly convicted and punished because the law thereafter changed"].)

Moreover, when, as here, the underlying felonies are punishable by life in prison, the 15-year minimum parole eligibility term set forth in section 186.22, subdivision (b)(5) applies in lieu of the 10-year enhancement.  (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004; *People v. Campos* (2011) 196 Cal.App.4th 438, 449.)  Therefore, the 10-year gang enhancements counts cannot stand.  On resentencing, those enhancements must give way to a minimum parole period of 15 years.[27]  Even though that period will not have any practical impact on Tran's parole eligibility date – since he must serve at least 25 years on those counts anyway – it is still required under the statutory scheme.  (*People v. Lopez, supra*, 34 Cal.4th at p. 1009.)

---

[27]     At the time Viet was murdered in 1995, the 15-year minimum parole eligibility requirement was contained in section 186.22, subdivision (b)(2).  Accordingly, it would not violate ex post facto principles to apply it in this case.

51

This analysis applies equally to Giang and Johnson, who have joined Tran's claim regarding the gang enhancements. It also applies to Tam, even though he has not filed a joinder request. (See *People v. Smith* (2001) 24 Cal.4th 849, 852 [an unauthorized sentence may be corrected at any time regardless of whether it was challenged in the trial court or on appeal].) Therefore, we will order the trial court to impose a 15-year minimum parole eligibility period in place of the 10-year sentence enhancements appellants received on the underlying counts.

*Cumulative Error*

Lastly, appellants contend the cumulative effect of the trial court's errors warrants reversal. While appellants' trial was not perfect, we do not believe the alleged errors, whether considered individually or combined, undermined their right to a fair trial. There is thus no basis to disturb their convictions.

DISPOSITION

Appellants' sentences are reversed and the matter is remanded for resentencing. On remand, the trial court must consider all of the principles governing the punishment of juvenile offenders in deciding Tran's sentence on the murder count. With regard to both that count and the conspiracy count, the court must also sentence each appellant to a minimum parole eligibility period of 15 years in lieu of the 10-year gang enhancements. In all other respects, the judgments are affirmed.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


IKOLA, J.

52